Good morning, your honors. My name is Ethan Ballon. This morning I speak for Antoine Johnson. I'm going to watch my own clock. I'm going to do my best to save two minutes for rebuttal. This is a close case, especially with respect to Mr. Johnson. After 14 days of trial from the moment of opening statement through the summations, the jury deliberated for nearly four full days. Of those 14 trial days, three were partial days. They ultimately returned guilty verdicts. I want to begin by talking about the confrontation error, and then I'm going to address the stop sign claim, and we have time to reach the Griffin error. To begin the confrontation claim, applying the wrong standard of review, the district court found that Antoine Johnson took action to make Veronica Burgess unavailable, and in so doing, the district court made two errors. In case one, he applied the wrong legal standard. In a trio of cases in the last six years, the Supreme Court in Crawford, Davis, and Giles has emphasized two points that resolve this case in Mr. Johnson's favor. First, the Supreme Court has made plain that the confrontation right contained in the Sixth Amendment is essential to a fair trial. It is critical for the fact-finding process. Equally important, Crawford and Giles make this clear, is we only apply exceptions to the Sixth Amendment right to confrontation that existed at the founding of the Republic. Now, we benefit, and that's Giles at 396, that's Crawford at 54, and we do understand how forfeiture by wrongdoing was interpreted at the founding of the Republic, because as Giles recognized, the leading case, the leading Supreme Court case on forfeiture by wrongdoing is Reynolds, which was decided in 1879, and it cataloged the common law on how we assess forfeiture by wrongdoing. And Reynolds said, we apply the same test as we do for lost wills and lost contracts. The preliminary fact of whether the testimony may be substituted is that the testimony was lost by clear and convincing evidence. In this case, there was not clear and convincing evidence, and the district ---- Okay. Your first point, I take it, is that the Court should have applied clear and convincing standards. Exactly. And the Supreme Court in Woodby says that lost wills at the time, common law, lost wills and lost contracts, to establish that it was a lost will, lost contract, to substitute the secondary evidence, you have to show by clear and convincing evidence this was the lost will. Now, this ---- there is a rule of procedure on this point. Yes. Oh, you're talking about the Federal Rule of Evidence. Yes. And as Giles makes clear at the end, I think Justice Scalia does an admirable job, that's fine for garden-variety hearsay, but these are testimonial statements. Statements to grand jury testimony and statement to police officers as interrogation are testimonial, so that's a constitutional rule, and while Congress, and Giles was clear on this, while Congress is free to, and this Court is free for non-testimonial statements to apply a lesser standard, the Sixth Amendment confrontation right is required to be applied to us as the law at the founding of the Republic, and that is the Woodby standard, that is clear and convincing evidence for testimonial statements, and I think the government overstates our claim. This only applies to testimonial statements, statements that are protected by Crawford's test of solemnity. And so if this was the introduction of testimony of a neighbor who heard Veronica Burgess say something, that would be different, but her grand jury testimony and her statement to the officers are protected by that constitutional standard. And it makes sense. Oh, sorry. Go ahead. Okay. And it makes sense for, I think, two reasons. One, forfeiture by wrongdoing is the substitution of testimony case. It is, but it addresses the reliability of testimony. That's what the confrontation right is. And the Supreme Court in Wade, when they're addressing a similar type of situation, what do you do when you have a tainted ID, which we have in these cases, right? When you have a tainted ID, how do you let the person testify, despite following a tainted ID, that that is the defendant, that is the person that committed the act? And what the Supreme Court said in Wade was, well, you're going to have to show by clear and convincing evidence that the in-court ID was not tainted, because since it deals with the reliability of the fact-finding process, we impose a higher standard. The same idea behind forfeiture by wrongdoing is it's a waiver. By conduct, the defendant has secured the absence of a witness. He or she has waived his right to enforce his or her constitutional right, his or her confrontation right. How can they complain? A waiver, again, is clear and convincing evidence. A waiver is we apply that standard with respect to a waiver where we're trying to protect the person's right. Just make sure that he's voluntarily understanding what he's doing. Now, I don't see how that applies where a defendant has arguably done away with a witness. But that's the problem, arguably. So the defendant who, to give up his rights, has to do it clearly. But the defendant who wants to assert his rights, the government can just say, he's arguably done something wrong. We don't need evidence of it. No, you have to have a preponderance of the evidence to show that he did. Well, I think the Supreme Court says, as a matter of common law, it says you don't. I think for a lost will, it says you don't. Yes. So the analogy of the waiver is you are saying by your conduct you've lost this right. Why does it have to be any less clear when you're doing it by conduct rather than by verbal conduct? What is the principal difference between you are losing what's been determined to be the most important right to ensure the accuracy of the fact-finding process that is your trial, but that the government can snatch away your right from confrontation on such a limited standard? When a civil fraud case at the founding of the Constitution, you couldn't prove civil fraud except by clearly convincing evidence. But now, based on the flimsiest of evidence, by preponderance, we can take away a person's confrontation right? I think that's inconsistent with Crawford and Giles and Davis. Well, what do you do with the language in Davis which talks specifically about this and says we take no position on the standards, but the Federal Rules of Evidence codifies the forfeiture doctrine and courts have generally held the government to the preponderance standard. And it seems to be saying that until we say otherwise, you apply the preponderance standard. Oh, I would disagree for two reasons. I would respond in one way, Reynolds, that they had no need to pass on it, but you have to deal with Reynolds. And Reynolds says the standard is you apply the test that is subject to lost wills and contracts. It's a preliminary question subject to Federal Rules. So that's a Supreme Court case on point and Reynolds plus Woodley equals clearly convincing evidence. But at the end of Giles, which postdates Davis, the dissent in Giles is arguing for a broader rule. They want to say that in any murder case, any statements that the victim made against the defendant come in. And the dissent relies on this domestic violence idea. And Justice Scalia and I think it's the sixth justice majority responds to it. And they say statements to friends and neighbors about abuse and intimidation, statements to physicians in the course of receiving treatment would be excluded if at all only by hearsay rules, which are free to adopt a dissent's version of forfeiture by wrongdoing. In any event, we are puzzled by the dissent's decision to devote its preparation to domestic abuse cases. It is the suggestion that we would have one confrontation clause, the one that the framers adopted in Crawford, described for all other crimes, and it goes on. And as Justice Scalia and the sixth justice majority's point is, for a Sixth Amendment confrontation clause, testimonial statements, they say fairness goes out. They say policy goes out. They say the rule is enforced as it was when the founders gave us this amendment, this Constitution. Kagan. I thought the question in Giles was whether or not you had to show that there was an intent to prevent the testimony. Well, that was dealt to me with debate between the two, but it was about what the common law held. Yes. Moving from the law, because I'm running through time faster than I want, I want to show the facts are insufficient, the district court had. There's not one fact my colleague will not identify, one fact of anything Antwon Johnson did to forfeit his right, one thing he did. What's clear from the record is the lawyers put the name out there on August 2nd, not Mr. Johnson. What's clear, if we accept the threat as true, and I'll – I can – there's a lot of reasons not to accept it as true, that it couldn't have come from Johnson because the threat involved showing papers, and Mr. Johnson was in solitary confinement, had no papers to show. So it couldn't have been him. But the timing falls nearly exactly when he met with his lawyer, correct? And the same day when his lawyers were out in the community giving Veronica Burgess a name to everybody. His lawyers were giving the name the morning of. He meets with his man lawyer that afternoon. Veronica Burgess already announced she wasn't going to testify on July 16th. The government doesn't do anything about it. This is beforehand. She said she was a missing person before Antwon Johnson knows anything. The government agrees with one thing. Veronica Burgess is a liar because she says she stays in touch with the police. They say they're wrong. She says she recants and explains why her original story was untrue. That makes more sense to us. They say that's wrong. So which version of Veronica Burgess is the truth? On August 5th, the last time we hear, the government hears from Veronica Burgess, they admit that she stopped cooperating on July 16th before Antwon Johnson got anything. But putting that away on August 5th, they hear from her again. The last time they hear from her until they arrest her after trial is it's all fine. She doesn't feel threatened anymore. This is government excerpts of record 3140. So she, if she doesn't show up, you can't say any of this is because of anything Antwon Johnson did. There's multiple other theories. She didn't show up on her own. She didn't want to be charged with perjury. She only came forward for the $175,000. But none of this shows evidence of Antwon Johnson taking one single action to lose this incredibly important confrontation right. There's also no good faith efforts to find him. The government agrees to the four-point Cook test that this is important for this critical witness. What happens when a threat comes in? There are no investigations. The government doesn't get the phone number she calls. Doesn't get the name of the Hoover. Doesn't get the name of the mother. Doesn't say let's get those phone records. Who's threatening this federal witness? Let's track down. Let's make sure the timing works. They have her in their office on the 16th of July. They don't give her a subpoena. The officer says it was intentional. He doesn't give her a subpoena. We know later on she's arrested. She's in a car with Patrick Smith in September. Had there been a material witness subpoena, she would have been arrested then and been available for trial. But the government didn't wait until two weeks before trial to do anything that is insufficient under Jackson. If the test is preponderance, does Mr. Johnson still win on this argument? Absolutely. They don't have any evidence of one thing Antwon Johnson did. I invite my colleagues to come up here and say we have evidence that Antwon Johnson did acts that caused Ms. Burgess to do something. There's no evidence that he did anything. They said he had a motive. Michael Williams had a motive. Porkchop Jackson had a motive. Others had motives. There's no evidence that Antwon Johnson did anything. I can't repeat that enough. He was in solitary confinement. Inferences are not to be drawn? No, absolutely not. Porkchop Johnson's in custody, been threatened with death. Michael Williams, he's facing the same penalty right then and there. Other people were implicated by her. So the fact that he is one of many, he's the one that's in solitary and can't get out. He can't show paper. How can he do anything about it? And we know his lawyers are spreading her name that morning. So other people may be responding to their response, but that doesn't put anything on Antwon Johnson. With one minute left, I'd like to, if I can, pivot to the wrongdoing claim. The lead prosecutor in this case was told four times by the district judge, don't tell the investigative lead. And after being shut down four times, the lead counsel decided she didn't like that answer and announced to the jury that Big Al Jordan implicated Antwon Johnson. And this is a problem for multiple reasons. It's testimonial, a co-defendant's testimony implicating it. The Supreme Court referred to it as devastating. Two, and I'm glad we have Judge Tomheim here. I would imagine what would happen if a defense lawyer blew through four stop signs and then announced the answer. I believe that defense lawyer wears a jumpsuit before the day is over. This counsel was told, your apology doesn't matter. Why did you do it? She never told why she did it. She was told not to do it, and she did it because she wanted to prejudice Antwon Johnson. And Big Al Jordan, not only his implication was unfairly announced as a Sixth Amendment violation, it was kind of untrue that implication is enough because the underlying facts are Everyone agrees that Big Al Jordan said okay was involved, but then his first lineup, he picked out the wrong man. Now, the parties dispute whether the second time he picked out the right man. Mr. Johnson's trial lawyers made a record that said he didn't. The government made a trial record that said he did. But everybody agrees he implicated the wrong guy from the first lineup, but the jury didn't get that. The jury got an announcement of Big Al Jordan implicated Antwon Johnson. Co-defendant Jordan implicated Johnson. That was unfair. It was intentional. The government should not be afraid to get away with it and prejudice him at the end of this case. I'd have to say at my last minute I'd underhand the questions now. Okay. Thank you. Good morning, Your Honors. Excuse me. John Monman for Mr. Williams. Your Honors, Mr. Williams's conviction should also be reversed because the trial court permitted a cooperating witness to testify to garden variety hearsay, a purported blame-shifting confession by an alleged co-conspirator. And this blame-shifting hearsay in turn was significant because it corroborated the testimony of the cooperating witness that Mr. Williams had confessed to him. The issue here I think is pretty narrow. The parties agree that the standard that we're addressing here is whether particularized guarantees of trustworthiness made this statement admissible under 804B3. There is a dispute as to the standard of review. The government says it's an abuse of discretion. However, whether hearsay statements bear particularized guarantees of trustworthiness is a mixed question of fact and law reviewed de novo, and that's Padilla v. Terry Hewn, the Ninth Circuit opinion. The big point here, the biggest thing that I want to emphasize is that this was a blame-shifting statement. This hearsay statement that the government got in against both defendants under 804B3 was entirely blame-shifting. The testimony was that Treystone, which is Michael Williams, was stupid and dumb and hard-headed and trigger-happy and opened fire on the guards. Not that we opened fire on the guards or I opened fire on the guards, but Mr. Williams did it. This is not an unselfconsciously self-incriminating statement as contemplated by this court in Boone, nor is the declarant here unabashedly inculpating himself while making no effort to mitigate his own conduct or to shift the blame. Again, this was a robbery, but it ended up being a murder. And the declarant in this case is pinning 100 percent of the responsibility for that murder onto Michael Williams. And this is, again, what the Fernandez court characterized as garden-variety hearsay. We also have the Fernandez factors, which the Fernandez opinion is a district court opinion, which is the only one to really address a case like this, where the government tries to introduce out-of-court statements by a hearsay declarant as to the theory of declarations against penal interest. And the district court in Fernandez identified other factors that the court should consider, one of which is whether the declarant would have had reason to suspect that the hearsay relator was cooperating. Here, the declarant, Derek Maddox, had a very good reason to suspect that Jamal Dunnigan, the hearsay relator, was cooperating, because Dunnigan had been cooperating for at least 11 years at that point and had cooperated against other people in the same street gang. And so even though there's no evidence necessarily that Maddox did, in fact, know that Dunnigan was cooperating, the standard here is whether he could have, whether he may have suspected it. At the other extreme, Dunnigan testified that he was an old-school original gangster and an influential member of the gang before he dropped out. So the declarant has an incentive to embellish. And then the biggest factor here of the Fernandez factors is that the government never established the close personal relationship that's required for admissibility of these types of statements. In Boone, we have a statement to a girlfriend who surreptitiously recorded it. In Padilla, there was a statement to a close friend. Here, we have two guys that are members of the same gang. But beyond that, the government failed to establish the close personal relationship. The other thing that is interesting about this test is the Fernandez court considered the believability of the hearsay relator himself, his credibility. There's a circuit split on this issue. The Fifth Circuit says that you should consider in cases like this one the credibility of the hearsay relator, especially where there is no recording of the statement. In Boone, the statement was recorded. In Padilla, it was not. But the Padilla court decided that it was not going to consider the credibility of the hearsay relator. But Padilla was an AEDPA case. And so the Padilla court was evaluating whether the State court's decision was contrary to a well-established Supreme Court rule. And it's not established. There's a circuit split. But the Fernandez court concluded that given that the particularized guarantees of trustworthiness analysis is in effect an exception of what would otherwise be the result under the Confrontation Clause, it should be narrowly construed to protect the accused's constitutional rights. Again, we have a bought-and-paid-for witness here.   was brought to court with all kinds of incentive to corroborate his own testimony that Mr. Williams had confessed to him by saying that someone else had told him the same thing. And in particular, you've adopted his argument as it pertains to your client. I'd like for you to focus on what the impact of Ms. Burgess's reported statements were or her testimony was on your client, particularly in regards to her inability or her inaccurate identification of your client. What prejudice resulted to your client from the admission of her testimony, given that she couldn't properly identify your client? Well, her last statement, she didn't identify my client. However, she did identify my client on three other occasions, and that was elicited by counsel from Mr. Johnson. Now, the question I'm posing is, but when the time came for her to try to pick out your client, she couldn't do it. So I'm wondering what impact overall her testimony had with regard to your client. Well, my argument is that those statements were testimonial. They – and this comes within the purview of Bruton, and that the limited instructions given by the Court were not sufficient, because even though she ultimately did not identify Mr. Williams, she did on three prior occasions, that was elicited by counsel for Mr. Johnson, the fact that she had previously identified Mr. Williams. This is the only non-cooperating witness, non-gang member, who inculpated Mr. Williams in any way. So overall, it was harmful? Absolutely. It was absolutely harmful, and I believe it comes within Bruton. Why wasn't the limiting instruction sufficient? Because under the Bruton line of cases, the idea is not just that it's a co-defendant inculpating another co-defendant. It's that there is inculpatory testimony without an opportunity to confront. And so this is different than other types of evidence where limiting instructions are appropriate. This is one where no limiting instruction is appropriate in the courts of the Senate. Thank you. We'll hear from the government. Good morning, Your Honors. Elizabeth Yang on behalf of the United States of America. In this case, the government did not commit reversible error or misconduct, and the district court properly admitted the statements of unavailable witnesses under Rule 804B6 and B3 of the Federal Rules of Evidence. I'd like to directly address each of Mr. Bailow's and Mr. Lemon's arguments, and then, with my remaining time, answer any questions the Court may have on the outstanding issues. Mr. Bailow makes a great deal in all of his briefs, as well as his argument here, that this was a close case and compresses the trial into 14 days and assumes the jury deliberated over four full days. I think the record speaks for itself that a lot of the jury deliberations are unknown, the duration, what exactly happened, what exactly they're talking about. The one thing the record does speak of, however, is that during their deliberations the jury sent out a single note prior to their note announcing they had a verdict. And that note had nothing to do with Defendant Johnson. It had to do with a very technical aspect of the DNA evidence regarding Defendant Williams, and that was they wanted readback of testimony on the slot block, which is at the amplification stage of forensic DNA testing. No other notes came out from the jury for their deliberations until they announced they had a verdict. Were they out for four days? Your Honor, what the record shows is they were out for three and a half days. What the record does not show is how many hours each day they deliberated, whether they took lunch breaks, how long those lunch breaks were, what time they actually reached a verdict, and the note got to the court and the court collected the parties to announce the verdict. And that is what the record is silent on. And the trial did last how long? It lasted approximately 14 days, three and a half weeks. Now, with regard to the Veronica Burgess evidence and Mr. Bailo's argument that a different standard should apply, I'd first like to, as a preliminary matter, I need to correct the record for the Court. In the government's answering brief at page 99, footnote 54, there is an unintentional misstatement. The government states in its answering brief that there is no record evidence to support Defendant Johnson's claims that another Hoover gang member's mother, in this case a Randolph Porkchop Jackson, was the person who contacted Veronica Burgess's common-law husband, Patrick Smith. Now, as the Court can see from the record in the district court, the forfeiture by wrongdoing issue was litigated. And at the time, the defense had provided under seal declarations to the district court and refused to provide those declarations to the government. This was raised several times at the district court. The declarations were never provided to the government. And on appeal, the parties stipulated to release those declarations to the government so they could be viewed in anticipation of this appeal. Through inadvertence, however, the government didn't get those declarations. So at the time its answering brief was submitted, it did not, in fact, have those declarations. It has them now, but I felt the need to correct the record because, as it stands now, the government's answering brief makes it appear that there is no record evidence. And, in fact, as Mr. Bailo pointed out, those declarations are on the district court record. They just were not accessible to the government. And they're not in his excerpts of records. So they show what? They show the contrary version of events that Mr. Bailo has argued in his brief about the changed chronology of events and who, in fact, was the source of the meeting with Veronica Burgess's husband, Patrick Smith, which I will address those in one moment. So I just wanted to correct that for the Court's record. In regard to the proper standard that apply, I think, Judge Schroeder, you noted the Davis case in 2006 where the Supreme Court, while not explicitly deciding the issue, noted that Federal courts apply the preponderance standard. The Supreme Court in Davis did so in the context of remanding testimonial statements. In this, in the Davis case, a witness had given verbal statements to law enforcement and then had signed an affidavit in the presence of law enforcement. So these were clearly testimonial statements. But the Supreme Court sent those statements back to the state court for the determination of the forfeiture by wrongdoing issue. Federal circuit courts before and since that time who have addressed this issue have uniformly applied the preponderance standard to, specifically, testimonial statements. For example, the D.C. Circuit in United States v. White at 116 F. 3rd, 912. The 1st Circuit in United States v. Houlihan at 92 F. 3rd at 1220, 1280, excuse me. The 2nd Circuit in Perkins v. Herbert at 596 F. 3rd at 167. The 6th Circuit in Steele v. Taylor at 684 F. 2nd at 1202. The 7th Circuit in United States v. Scott, 284 F. 3rd at 762. The 8th Circuit at U.S. v. Emory, 186 F. 3rd at 926. And the 10th Circuit in United States v. Price at 186, I'm sorry, 265 F. 3rd at 1103. Have all applied the preponderance standard in determining whether testimonial statements, statements to law enforcement and grand jury testimony is admissible under 805. I haven't read all those cases. Was the argument made in those cases that the clear and convincing should apply? In some of those cases, the defense explicitly argued clear and convincing should apply. And the cases, the circuits had said we are in accordance with our sister circuits if the proper standard is a preponderance standard. And specifically in Perkins v. Herbert, the 2nd Circuit case, it did cite a New York State case. I believe it's People v. Garacci, 85 New York 2nd, 359, which Mr. Bailow relies on his brief as applying the clear and convincing standard in New York State courts. But the 2nd Circuit explicitly states that's the standard in State court, but in Federal court it's preponderance. Has the government or has defense gone for cert in any of those? Not based on the court. I'm sorry. The government's shepherdizing in those cases last night. It does not appear so. In this case, the government, so the proper standard is a preponderance standard. The government more than adequately satisfied that standard. Even if the do elaborate a little on that. Sure. I just want to make one more comment. Even if the court decides clear and convincing applies, the government also submits it has satisfied that. Defendant has argued that the government has waived that argument. But as the court has previously said in prior arguments, you can affirm on any basis finding an adequate support in the record. Now, with regard to the preponderance standard, the district court made findings in its order, which is at the Williams excerpt of records 7 to 16. The government would submit those are not clearly erroneous. By August, on August 2, 2009, the only person who had the information, the motive and the ability to have a hit placed or threat issued to Veronica Burgess was Defendant Johnson. As the court can see from the record, on August 2, 2009, there were only two defendants who were in jail facing death. There were only two defendants who the government was pursuing the death penalty against for this armored truck robbery murder. And that was Defendants Williams and Johnson. And the court can see at clerk's record 1359 and 1360, the notices of intent to seek the death penalty against those two defendants. On August 2, the only people, other than the government, who knew the identity of this citizen witness were Defendant Johnson's attorneys and Defendant Williams' attorneys. And Defendant Johnson, when one of his lawyers went to see him at approximately 12 noon to relay that information. That is at government's excerpts of record 52 and 55. Well, defense has argued that Johnson's attorneys, the same time they got the information, promptly went out and started asking questions about Ms. Burgess and that by itself could have identified her. Does that get attributed to Johnson? Arguably, Your Honors, depending on what his attorneys said. I should pose it the other way. Suppose we don't attribute it. I mean, is there a reason not to attribute it to Johnson? And if so, isn't it at least as likely that that's how people in the neighborhood come to find out that maybe Burgess is talking? I will answer that in two ways, Your Honors. One, I don't want to impute negative intentions on defense counsel. I'm quite sure that when they went out to start contacting witnesses and collecting information on Ms. Burgess, it wasn't their intention. And that's important. When I really say impute, what I'm doing is taking out the notion that the action was done to make sure the witness didn't appear, which is a critical factor in the waiver. And so what is it that causes, should cause, should support the district court's finding that it must have been Johnson, whose motivation was evident, but whose opportunity was at least inhibited, as opposed to the lawyers who have a bona fide reason for going out and trying to find out whatever they can about this witness in such a way that might cause other people in the neighborhood to become aware that Burgess is of interest? Your Honor, I think that I can answer that in this manner. There is nothing in the record that indicates who exactly Johnson's defense attorneys went out to contact, other than a very general statement of friends and community members.  And that's why I think it's important to have the motivation to then relay to the Hoover gang, who are documented gang members who use violence and intimidation to threaten witnesses, to encourage them not to participate in the legal system, to go to these violent gang members and say, my friend, my family member, my community member, Veronica Burgess, is talking to the police. But there is no evidence in the record specifically that Johnson contacted anyone at that period of time, is there? There is not, Your Honor. There is the reasonable inferences that can be drawn from the chain of events that the government has set forth. It's just a timing issue, that's all, right? It is a timing issue for which there is no other logical explanation. Do you really think that satisfies clear and convincing? Your Honor, I do, because he is the only source of that information, given the timing of the hit that the Hoovers put on Ms. Burgess on August 2nd, that same day, as Patrick Smith relayed to the LAPD detective. Defendant Williams did not know Ms. Burgess' identity on August 2nd. Even if the defense team for Defendant Johnson had gone out to start interviewing community members on August 2nd, there is no indication that those members had any affiliation with the Hoover gang and would have the connections or the ability to contact them to report that Ms. Burgess had been cooperating with law enforcement. It seems more plausible that there may have been a connection there, as opposed to Johnson making a connection from his solitary confinement. Your Honor, I would respectfully disagree. I think that the information the government put on the record about his ability, while confined in solitary confinement, to communicate with other inmates within MDC, what is not on the record but is what the district courts and the government's common experience, news travels very fast from inside and outside of prison. And the ability for Mr. Johnson to communicate Ms. Burgess' identity to someone who he knew could then contact someone on the outside is not so far afield. This is a very experienced judge, I believe. Yes, Your Honor. And on August 2nd, 2009, the only person who Veronica Burgess had consistently identified as being at that planning meeting was the defendant, Defendant Johnson. And also, as government noted in its papers, at Excerpts of Record 29 and 32,  the only person who was able to know the identity of that witness was the defendant Johnson, when he had previously called his counsel 45 days prior to a trial date and was very upset to learn that they could not disclose her identity to him at that time. The limiting instruction, would you like to comment on why that was sufficient in light of the warnings in Bruton about the problems of jurors drawing lines? Yes, Your Honor. In terms of the Defendant Williams issue, there was no actual affirmative evidence that Ms. Burgess had identified Michael Williams as being at the planning meeting. The elicitation of that testimony by Defendant Johnson's team during cross examination was not to elicit that testimony for the truth of the matter asserted, that, in fact, Defendant Williams was at that planning meeting. It was clearly designed, and Defendant Johnson's counsel stated this prior to the testimony coming in, because Williams had objected, that it was designed to show that Ms. Burgess was an unreliable reporter, that she had previously identified Williams, then didn't identify him, and so you cannot believe any of her identifications of Defendant Johnson. Where the evidence is not being admitted for the truth of the matter asserted, the Court's limiting instructions were sufficient to cure any potential prejudice. And here in this case, the Court gave limiting instructions not once and not twice, but three times. In fact, four times. I should correct myself. At Government's Excerpt of Records 2003 to 2004, he gave a limiting instruction that the jury was not to consider any of the Veronica Burgess evidence as against Defendant Williams in any way whatsoever at the beginning of her any testimony regarding her statements. At Government's Excerpt of Records 2032, he gave the instruction again during the course of having several witnesses testify about her statements. And at Excerpts of Records 2172 to 2173, he gave it after the conclusion of all of the testimony about her prior statements to law enforcement. And then again in his final charge to the jury at Excerpts of Records 3061, the Court again reminded the jury that they were not to consider any of that Veronica Burgess evidence as against the Defendant Williams in any way. And given those repeated limiting instructions during the course of the testimony about her statements, at the conclusion of the testimony, and again in his final charge to the jury, the Government submits that those were adequate to cure any potential prejudice to Defendant Williams. So what was the testimony? I mean, the limiting instructions only go so far. And the jury hears what it hears. Yes, Your Honor. The intent of Johnson's counsel really doesn't matter much to the jury. What did Burgess have to say about Williams? How could we be confident that Williams doesn't get prejudiced by what's related by Burgess, a witness who's not testifying against him, but he's trapped in the same trial? So why wasn't that testimony so damaging as that Williams was prejudiced? Well, Your Honor, there are two answers to that. One is the jury is presumed to follow the court's instructions. And I do believe that when the court repeats the very specific limiting instruction repeatedly to this jury, that they are charged with following those instructions. But more to the point, Your Honor, the manner of the questioning, the elicitation of the prior identifications was not to the extent of – and she identified Michael Williams as being at the planning meeting. It was more along – when you showed her several six-packs, did you show her another six-pack of – you know, yes. Did she identify someone from that? Yes. Defendant Williams, yes. Well, in your report of that interview, does it list that you identified – she identified Defendant Williams? Yes. Well, in your notes of that interview, did it show that she had identified Defendant Williams? No. So it was intended, and what sort of – what comes across in the examination is that it wasn't that Defendant Williams was definitively there. It's that she identified him, but the law enforcement was sloppy in their report writing or note-taking, and that, in fact, she later didn't identify him, and she misidentified him. She identified someone who was in custody as being Defendant Williams, and she identified Derek Maddox as being Defendant Williams, the clear implication being that she is very unreliable in what she told the law enforcement. Addressing the allegation that the government has committed misconduct when it asked the question referencing the investigative lead provided by the co-defendant, one thing I'd like to clarify, the government in its papers has not conceded, as Mr. Bailoff says, that it committed misconduct or reversible error. The government does concede that it was a mistake, it was error to ask that question, that it was irrelevant, and that it was problematic. But this case is far afield from Acampo v. Vail and Ryan v. Miller, which Mr. Bailoff cites in his brief. In those cases, while the question itself is similar, and that the details of the statement were not revealed, but the clear implication was that a statement was made, that's where the similarities end. In Acampo and Ryan, multiple questions were asked that left the clear implication that a co-defendant or another suspect had confessed. In addition, testimony was given in response to those questions, so there was actual evidence admitted about those statements. And more significantly, in both cases the prosecutor used that testimony and argued it in closing argument quite vociferously. Here you have a single question. The defense timely objected. The court sustained the objection. There is no evidence, Your Honors, that was admitted about the investigative lead provided by Co-Defendant Jordan. And the prosecutors did not further follow that line of questioning in its examination of the detective, and it did not mention in closing argument. For those reasons, the government would distinguish the cases cited by Mr. Bailo in his brief. Again, in terms of the allegation of misconduct, Greer v. Miller, the Supreme Court, instructs that we should look at an objectable question in the context of the entire trial. This was a question out of approximately, and I did count, 2,100 transcript pages of witness testimony alone. There was an immediate objection. Again, there was no answer, and the court gave a limiting instruction that questions are not evidence. With regard to the Maddox issue raised by Mr. Lemon, the government has not conceded that the Particularized Guarantees of Trustworthiness requirement of Ohio v. Robert applies here. That is still an open question in the circuit, but for purposes of argument, we are assuming that it does. And again, the government submits that the district court's findings in this regard are not clearly erroneous. Mr. Lemon raises the Fernandez case, the district court case from 2001. I'd like to just point out a couple of very critical distinctions between that case and the present case. In Fernandez, the court found that both the declarant and the relator, the witness, were in custody at the time that the statements were allegedly made, so the declarant would have a reason to be wary of discussing his case with someone else. Here, the record is clear that both Maddox and Dunnigan were out of custody at the time in their neighborhood. The other distinction is in Fernandez, there was apparently a birthday card reflecting some sort of deal between the declarant and the relator that the relator would not tell law enforcement about the declarant's involvement in the crime. Here, there's no evidence that Maddox knew about Dunnigan's cooperation years ago, and there's also no such deal. Lastly, the declarant and relator had not even met prior to being held together in the Fernandez case. Here, the record's clear that Maddox and Dunnigan were close enough as fellow gang members that Maddox sought out Dunnigan's assistance prior to the robbery to get seed money to buy disguises and what he needs for the robbery, and also he sought him out after the robbery as an intermediary to bring the other robbers together, as he said, to the table, since they had all split up when the robbery went awry. And, in fact, he had Dunnigan meet him at his auntie's house, which reflects a very close relationship that he would invite him, and Dunnigan would even know where his auntie's house is in the neighborhood. And with regard to blame shifting, I think the government has addressed that in its brief, as I'm running out of time. You've run out of time. I have run out of time. But we appreciate the effort and the good nature. Thank you, Your Honor. Thank you for the argument, and we'll hear the rebuttal. As the clock indicates, I'll be brief. My first rebuttal point will be dispositive. My name is Ballot. It rhymes with shallow. And hopefully you get that right going forward, since I see some of you on more than one occasion. With my substantive points, which I'd like to respond, I can't speak to the welter of cases the government just cited for the first time, but I'll make a wager with the court blind. None of them discussed Reynolds and Reynolds' statement of clearly convincing evidence, and none of them discussed would-be, the 1968 Supreme Court case saying that clearly convincing evidence under the common law was required to prove a lost will or a lost contract by secondary evidence. And if they do, then they'll be very persuasive and difficult for this Court to distinguish. And if they don't, then they don't speak to the question as we've presented it on behalf of Mr. Johnson. With regard to putting aside which standard applies to this case, the evidence is insufficient. I want to spend my last minute on just highlighting a few things, if I may. There's three ways to look at it. One, are the threats true? If they are true, then it can't be Johnson, because he doesn't have paper to show. He can't show paper. His lawyers didn't show paper. So if the threats are true, it's coming from someone else from someplace else. Are the threats false? And there's reasons to believe so. She's offered protection on the 16th. Before her name's released, she declines because she wants to be in a car club. She's offered protection on the 3rd of August when the claims are regularly there. She declines again for an unknown reason. Again, the government doesn't investigate the threats to find out who does it. But if the threats are false, then there's no way he procured her absence by it. So either way, it doesn't go to Johnson. I think ultimately the problem is, besides having no evidence, is the government's asking on the same written record to pick and choose. The vents work. A possible conversation. Williams and Johnson. You get the witness names. Yeah, who's testifying against us? I know some woman named Burgess and a guy named Lee. I don't know them. You know them. I don't know them. No, he's got the information. Did it go down that way? I think most likely what the evidence shows is exactly what happened. Porkchop Johnson knows Burgess. Her mother, Patrick Smith, used to date Porkchop's mother. Porkchop Jackson's in jail being investigated by the LAPD for being the ringleader of this robbery. Porkchop Jackson has the same interest and actually has the personal connection. If you look at Burgess's connection to this case, she comes forward because who does she know? Porkchop Jackson. There's plenty of other people there if you want to accept the threats who are responsible, but again, there's not one shred of evidence, not even a preponderance. We'd ask for a personal background for the trial. Thank you. Thank you. We thank all counsel for your helpful arguments. I've learned I need a more colorful nickname. I feel left out. With that, the case just argued is submitted.
judges: Tunheim, Schroeder, Clifton